## Reynolds v. Community Fuel Co.

March 15, 1949.

LeRoy W. Fields, and J. L. Hays for appellant.

Harry L. Moore, J. Keller Whitaker, and Anthony Thomson for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SIMS—Affirming.

Appellant, Goble Reynolds, brought this suit in equity against appellee, Community Fuel Company, hereinafter referred to as the Company, to recover $2,000 damages done to his home and to the health of himself and family as a result of an alleged nuisance committed by the company in the operation of a coal loading ramp near his home, and to enjoin the Company from continuing the operation thereof. The answer was a traverse.

After considerable proof was taken by depositions, the chancellor rendered judgment denying any relief and dismissed the petition. The sole question presented on this appeal is whether under the proof appellant established the existence of a nuisance. A correct decision of the case necessitates a brief review of the evidence.

In September 1943 Reynolds bought a four room house located on a small lot in Blackey, a coal mining village on the L. & N. Railroad in Letcher County. He paid $350 for the property but testified he improved the house and that at the time of giving his deposition he had $700 invested in this home. The house fronts on, and is only twelve feet from, an unimproved street which runs alongside the railroad right-of-way. This street is thirty feet wide and is really nothing more than a dirt road, improved only with ashes spread thereon by the abutting property owners.

The Company leased part of the right-of-way from the railroad upon which it started the erection of this structure in the spring of 1944 and completed it in time to put same in use in the fall of that year. It is 262 feet long, 16 feet wide and 30 feet high in the center, where a dock is located for dumping coal into a bin after the load is weighed. The coal is then carried from this bin by an

electrically operated conveyor and loaded into railroad coal cars. This ramp cost $10,000 and is of sufficient size to handle the output of about 17 truck mines in the community, with a capacity of some 500 or 600 tons a day, and to load the coal into cars on four railroad tracks.

The chief industry in Blackey appears to be this large ramp. Customarily, it is in operation in the summer months from around 6:30 a. m., until the middle of the afternoon. Only twice has it run at night, and then just for a couple of hours. The coal is usually wet when handled on the ramp, but occasionally some dry coal is dumped into the bin. There is evidence in the record that since this ramp was put in operation business has improved in the village and that some of the increase in property values has been due to the ramp.

This structure is located adjacent to the main line of the railroad over which four passenger trains run daily, as well as numerous freight trains. There are four or five tracks near the ramp and there is much switching of cars during the day in these railroad yards. The operation of these trains cause considerable noise, not to mention dust, soot and cinders. Then too, there is a great amount of vehicular traffic on the dirt and ash-covered road in front of the Reynolds home, which raises much dust in dry weather.

The testimony of Reynolds and his wife is that there is so much noise from the ramp that a conversation can be carried on in their home and yard only with difficulty. That dust and dirt come from the ramp in such quantities as to compel them to keep their house closed all of the time the ramp is in operation; and it is impossible to keep the house, inside and out, clean. That Mrs. Reynolds cannot hang laundry out in her yard to dry without getting it soiled, making it necessary for her to wash it again. The Reynolds further testified that the noise and dirt from the ramp had made Mr. Reynolds sick and caused him to lose time from his work as a miner, and had caused his daughter, as well as other members of his family, to suffer an illness. That before this structure was built they were not annoyed with dust or noise.

Reynolds testified that since the ramp started operations several persons had tried to buy his property, one

of whom offered him $800 for it, but he refused to sell as he had bought the place for a home. F. S. McComas, President of the appellee Company, testified that he would pay $900 for the property as that was its reasonable market value.

The only other witnesses testifying in behalf of appellant were Herman Sloan and wife. There is but one house between their home and the Reynolds property, the latter being somewhat nearer the ramp than is the former. The testimony of Mr. and Mrs. Sloan corrobated that of appellant and his wife.

The Company introduced a large number of witnesses who testified that the operation of the ramp caused no great or disturbing noise, nor did it cause any unusual amount of dust or dirt. Some of these witnesses live almost as close to the structure as does appellant. Two of them, Hattie Hodges and her daughter, Bertha, lived on each side of Mr. Reynolds. They both testified that no unusual noise or dirt resulted from the operation of the ramp; nor did the laundry they hung out in their yards get soiled, except the daughter had to do over a few pieces on one occasion.

Mattie Pearsall formerly lived in appellant's property and after the ramp was put in operation she went to look at his home for the purpose of buying it. She testified that she found the house clean inside and outside. She and several other witnesses gave evidence to the effect that there was lots of dust and dirt in that vicinity before the ramp was built. Vernon Whitaker lives within sixty feet of the ramp and he testified that but little dirt and noise were caused by its operation.

Without further detailing the testimony, it will suffice to say that none of the 15 or 20 witnesses testifying for the Company were annoyed, disturbed or inconvenienced by any dirt or noise coming from the ramp. Several of them stated that as much dirt and noise was caused by the railroad and the vehicular traffic on the dirt road, both of which were in front of appellant's property, as came from the ramp.

The evidence as a whole greatly preponderates in favor of the Company and abundantly supports the finding of the chancellor that the operation of this ramp in this locality was not a nuisance.

Appellant puts much reliance in such cases as Wheat Culvert Co. v. Jenkins, 246 Ky. 319, 55 S.W.2d 4; Kentucky & West Virginia Power Co. v. Anderson, 288 Ky. 501, 156 S.W.2d 857 and Board of Ed. of Louisville v. Klein, 303 Ky. 234, 197 S.W.2d 427, to sustain his position that the Company has so operated its plant as to make it a nuisance. An examination of these authorities shows that the operation of the ramp is not a nuisance per se. In determining whether or not it is a nuisance per accidens, we must take in consideration the manner and place or locality in which it was run, and the effect it has upon the average person in the community with normal sensibilities rather than how it affects the fastidious or sensitive few. As was said in the Anderson case [288 Ky. 501, 156 S.W.2d 859], "[A] trifling annoyance and inconvenience does not constitute an actionable nuisance, and the locality and surroundings are of importance." The Klein opinion states that each case of this character must be determined on its own state of facts.

Let us apply the above law to the facts in the instant case. Admittedly, some dust and noise emanate from this plant; but only four of the twenty-four persons who testified in the case were annoyed or discommoded by it. This is a mining community and this ramp is the chief commercial enterprize in the town. It has had a decided tendency to stimulate business and to increase property values in Blackey. While appellant's home is located within 42 feet of the ramp, it is almost that close to the main line of the railroad, as well as the yards, where train movements are numerous and cause much dirt and noise. Also, his house is just 12 feet from a dirt and ash-covered road on which there is much traffic with resulting dust in dry weather. In the circumstances it cannot be said that the manner in which this ramp was operated constituted a nuisance. If it were a nuisance, appellant could not recover damages for his annoyance, discomfort or sickness. It is competent to prove such things as affecting the depreciation in the market value of his property or the diminution of the value of its use, depending upon whether the nuisance is permanent or temporary, but no recovery may be had for them. City of Hazard v. Eversole, 280 Ky. 621, 133 S.W.2d 906.

The judgment is affirmed.